Mr. Justice Hagner
delivered the opinion of the court.
This is an appeal by the District of Columbia from the decree of the chancellor of the 12th of November, 1880, perpetually enjoining the Commissioners of the District and their successors from selling or advertising for sale the property mentioned in the bill of complaint on account of the several tax levies and assessments mentioned in the *219 case, and from setting up the said levies and assessments, or attempting to collect or enforce the same or any part thereof.
The property referred to is the bridge structure across the Potomac river from the city of Georgetown to Virginia. The right of the Commissioners of the District of Columbia to collect the taxes therein referred to is contested upon a variety of grounds set forth at large in the bill; and which will now be considered in turn.
First. It is insisted on the part of the Bridge Company that the property in question is exempt from taxation by express provision of law.
The Chesapeake and Ohio Canal Company was incorporated by the State of Virginia in 1824, and by the State of Maryland in 1825. By the terms of these statutes the charter was not to become operative until the Congress of the "United States should give its assent to its provisions ; and this ratification and assent were expressed by the act of Congress approved March 8, 1825. Section 9 of the charter declared “ that the said canal and all other works aforesaid or required to improve the navigation thereof at any time hereafter, with all their profits subject to the limitations herein provided and to none other, shall be, and the same are hereby vested in the said stockholders, their heirs and assigns forever, as tenants in common, in proportion to their respective shares, and be forever exempt from the payment of any tax, imposition, or assessment whatsoever.”
By the 21st section of the charter it was further provided that the right to the waters of the Potomac for the purpose of any lateral canal which the States of Virginia or Maryland might authorize to be made in connection with the said canal, was reserved to the said States respectively; “that the Government of the United States should retain the power to extend the said canal in or through the District of Columbia on either or both sides of the Potomac river,” and that before the charter should take effect “ the Congress of the United States should authorize the States of Virginia and Maryland, or either of them, to take and con *220 tinue a canal from any point of the above-named canal, or the termination thereof, through the territory of the District of Columbia, or any part thereof, to the territory of said States, or either of them, in any direction they may deem proper upon the same terms and conditions and with all the rights and privileges and powers of every kind whatsoever that the company incorporated by this act have to make the Chesapeake and Ohio Canals
The eastern terminus of the canal route remained in Georgetown, until Congress, by the act of 26th May, 1830? incorporated the Alexandria Canal Company authorizing the construction of a canal from the line of the Chesapeake and Ohio canal in Georgetown, across the Potomac river, to a point on the river in or near the city of Alexandria. Under that charter a canal was conducted across the Potomac at Georgetown upon an aqueduct supported upon piers, built on rock in the bed of the river, and upon stone abutments. • The Alexandria Canal Company for many years operated the canal, until the 16th of May, 1866, when the Board of Public Works of Virginia, under authority of law, united with the city of Alexandria and with the Alexandria Canal Company, in a lease of the canal, its aqueduct, locks, banks, and all other, its" property, rights, and franchises, unto Henry H. Wells, Philip Quigley, William W. Dungan, their heirs and assigns, for ninety-nine years from that date. This lease and conveyance were ratified by act of the General Assembly of Virginia in the following year, and the lessees were thereby empowered to erect, build, operate, and maintain across the Potomac river, over the stone piers on which the acqueduct rested, a new aqueduct of wood, iron, or stone, and in connection therewith a bridge *of the same material for the passage of persons, animals, wagons, &o.
On the 27th of July, 1868, the assent of Congress was given to the construction by the said lessees of the bridge over the aqueduct and piers, for the passage of railroad tracks, persons and vehicles, and the act authorized the collection of tolls by the lessees from persons using the bridge.
*221 On the 13th of October, 1867, the complainants were chartered and became a body politic under the laws of the State of Virginia, by the corporate title of the Alexandria Canal Railroad and Bridge Company, and, after its incorporation the said Wells, Quigley, and Dungan, with the consent of the Alexandria Canal Company, conveyed all their rights as lessees to the complainants.
Is the property in question exempt under a proper construction of these statutes?
The exemption of all the property of the Chesapeake and Ohio canal by the original charter is ample and explicit. The legislatures of the different States, in an unmistakable manner, declared that the property of the canal should be forever free from the payment of any taxation, imposition or assessment whatsoever, and Congress assented to that exemption. But in our opinion this exemption cannot be properly construed as embracing the property of the complainants. It is an established principle that the power of taxation is the highest attribute of sovereignty ; that its existence will always be presumed ; that, wherever an exemption from taxation is claimed, the language surrendering the power must be clear and unmistakable ; that a State cannot strip itself of this most essential power by doubtful words ; that as its existence rests upon necessity and is inherent in every sovereignty, wherever on any fair construction of the legislation invoked, there is a reasonable doubt whether the claim for the exemption is made out, that doubt must be solved in favor of the sovereignty. In other words, that the language used must be of such a character as, fairly interpreted, leaves no room for controversy on the point.
Now plainly such is not the case in the present instance. The charter of the Alexandria Canal Company of May 30 in many particulars is copied from the original charter of the Chesapeake and Ohio canal, but in section 9 of the charter of the Alexandria Company, corresponding with section 9 of the original charter, the words of exemption from taxation are studiously omitted, although the rest of the section is literally copied. See 6th Stats, at Large, 422. There can *222 be no pretence that the exemption contended for is granted in express terms. And by the decisions of the highest courts of the country, the existence of a doubt on the point, settles in our opinion, this contention conclusively against the complainants. The most recent utterance of the Supreme Court on the subject was its opinion at the October term, 1880, in the unreported case of the Annapolis and Elk Ridge Railroad Company vs. The County Commissioners of Anne Arundel County. The railroad company was incorporated by an act of'the general assembly of 1837. By section 5 of this charter the company was invested with all the rights- and powers necessary to the construction and repair of a railroad from the city of Annapolis to connect with the Baltimore and Washington road, “and for this purpose the said president and directors may have and use all the powers and privileges and shall be subject to the same obligations that are provided in sections 14 to 23 inclusive of the act entitled an act to incorporate the Baltimore & Ohio Railroad Company.” Section 18 of the charter of the last-named company contained this provision : “ and the shares of the capital stock of the said company shall be deemed and considered personal estate, and shall be exempt from the imposition of any tax or burthen by the States assenting to this law.” It had uniformly been held by the Maryland courts that under this clause the property of the Baltimore and Ohio Railroad Company was exempt from taxation.
In like manner it was insisted on behalf of the Annapolis company, that under these statutes, its property was exempted from taxation, and no claim to the contrary had been made from 1837 to 1876. But the Supreme Court held that the Annapolis and Elk Ridge Company was invested with all the rights and powers neceesary to the construction and repair of a railroad and for that purpose was to have and use all the powers and privileges contained in the enumerated sections of the Baltimore and Ohio charter; that this was not a grant of all the powers and privileges of the latter company but only of such as were necessary to carry into effect the objects for which the¡ new company was incorporated, and *223 consequently, that only such of the privileges of the old company could be enjoyed by the new as were appropriate to the work the new company was authorized to do ; that exemption from taxation could not be considered as one of the privileges granted, as it was not necessary either to the construction, repair or operation of a railroad ; and hence that the power to tax the property of the Annapolis and Elk Eidge Eailroad Company could not be considered as having been relinquished by the State, either by express terms or by any fair implication.
To the same effect was the decision of this court in the case of the Baltimore and Ohio R. R. Co. vs. The District of Columbia, reported in 3 Mac Arthur, 122.
In February, 1831, Cougress passed a law authorizing the extension into the District of Columbia, by the Baltimore and Ohio Eailroad, of a lateral railroad in connection with the main branch located from the city of Baltimore to the Ohio river in pursuance of their said act of incorporation, and the statute proceeded, “ and the said Baltimore and Ohio Eailroad Company are hereby authorized to exercise the same powers, rights and privileges and shall be subject to> the same restrictions in the extension and construction of the said lateral railroad into and within the said District as they may exercise or are subject to under and by virtue of their said charter or act of incorporation in the construction or extension of any railroad in the State of Maryland, and shall be entitled to the same rights, compensation, benefits and immunities in the use of the said road and with regard thereto as are provided in their said charter.”
It was claimed by the railroad company that this operated an exemption from taxation by Congress of the property of the company in the lateral road within the District of Columbia. But it was held by this court that such was not its effect, either by express terms or by necessary implication, and that its property lying within the District of Columbia was subject to taxation in the same manner as the property of private individuals.
The 21st section of the charter of the Chesapeake and *224 Ohio Canal Company-declares that the canal which Congress may authorize to be constructed from the terminus of .the Chesapeake and Ohio through the District into Virginia, shall be continued “ upon the same terms and conditions and with all rights and privileges and powers whatsoever that the company incorporated by this act have to make the Chesapeake and Ohio canal.” The rights, privileges and powers which it is thus stipulated are to be communicated to the new canal are those which the original canal had to make the Chesapeake and Ohio canal. The powers to make the canal may be exercised quite independently of any exemption from taxation. Canals may be and generally are made without any such exemption, and the principle announced by the decisions in construing claims of exemption require us to decide that the privileges and powers secured to the new canal cannot be held to include an immunity from taxation.
But if the statutes which we have been considering could he held to have exempted the Alexandria Canal Company from taxation, still such exemption would not exonerate the property from assessment in the hands of the present holders. In virtue of the act of the General Assembly of Virginia of February, 1866, the canal company has transferred to the lessees above named all its property and franchises, and it has been held repeatedly by the highest courts that such transfer does not carry with it an immunity from taxation in the hands of the new proprietors. Such was the decision in Morgan vs. Louisiana, 93 United States, 221, and in Railroad Company vs. The County of Hamblen, 102 United States, 277.
In the first of these cases it was held that where the property and franchises of a railroad company were sold under a decree, the immunity from taxation of the property of the company guaranteed .in the act of incorporation did not accompany the property in its transfer to the purchaser, since the immunity from taxation in such case was a privilege granted to the company itself and not transferable. In the latter case it was held that where, under a decree to *225 enforce a statutory lien retained by the State upon the property, real and personal, stock and franchises of a railroad ■company, the property and franchises were sold, the property was thereafter subject to taxation under the laws of the State, and that the immunity therefrom, possessed by the company, did not pass to the purchaser. It is a circumstance not without significance, that the lessees covenant by their articles of agreement to pay all taxes upon the property leased them by the canal company.
Again. It was no feature whatever of the original grant of incorporation to the Alexandria Canal Company that’it should maintain a bridge for passengers, vehicles or railroad cars over the top of the aqueduct carrying their canal across the river Potomac. A railroad or foot bridge was in no sense an appropriate part of a canal, or within the purposes or contemplation of those who granted the franchise to the company. These lessees, by the acts of Virginia' and of Congress, have been entrusted with a further and additional privilege not enjoyed by the lessors under whom they claim. If the canal company itself, by subsequent legislation, unaccompanied by an exemption from taxation, had been authorized to construct this bridge, the new property thus created could not have been fairly included under a grant of exemption of the property of the canal; and still less could the right of the sovereign to exact taxes be presumed to be waived in favor of the lessees.
We are, therefore, clearly of the opinion that there is nothing in the legislation relied on which exonerates the complainants from taxation.
Second. It is insisted in the bill that the property upon which this tax is sought to be levied is not within the jurisdiction of the District of Columbia, and for this reason is not assessable by the District authorities.
The complainants are the owners of the aqueduct and canal which is carried over it, extending from the Chesapeake and Ohio canal in Georgetown across the Potomac river to the Virginia shore. The wooden bridge in question is supported upon a Howe truss resting on the piers over the top^ *226 of the canal. This wooden bridge begins at the southern terminus of Lingan street in Georgetown, crosses the Chesapeake and Ohio canal to the first or northern abutment of the aqueduct, and up to that point is all within the limits of the city of Georgetown. It then crosses over the water of the river, and from high water mark on the Virginia shore extends by an elevated structure of some six hundred feet, in length to the level ground in Virginia., There can be no question that the whole of the structure from the commencement in Georgetown to high water mark on the Virginia shore, is within the jurisdiction of the District of Columbia.
By reiterated decisions it has been perfectly settled that the whole bed of the Potomac river, with all the islands therein, up to high water mark on the Virginia shore are within the explicit terms of the Maryland charter. An interesting point of grammatical construction in the Latin of the original charter demonstrates this. In describing the boundary, the charter declares that the line should pass from Delaware bay in a right line by the fortieth degree of north latitude westwardly, “unto the true meridian of the first fountain of the river Potomac; thence verging towards the south into the further bank of the said river, and following the same on the west and south unto a certain place called Cinquack,” &c. In the English translation, the expression “ the same ” may be equally applied to the bank, or to the river. In the latter case the line would be the middle thread of the river, which would have divided it equally with the State of Virginia. But the language in the Latin of the charter is “ ad ulteriorum, dictiflummis ripam, et earn sequendo,” &c,; and the use of the feminine relative pronoun earn shows that ripam, which is feminine, was the antecedent referred to rather than flumen, which is neuter. Whatever rights Maryland had in the river Potomac within the District of Columbia have devolved upon the District.
Third. By the act of the 20th of June, 1874, the District government was only authorized to levy a tax upon real estate -within the District, and it is insisted upon the part of the complainants that this bridge cannot be considered as *227 coming within that description. If such is the case, the tax levied under the act of 1874 would be illegal. In our opinion the bridge is realty within the meaning of the law. Things real consist of lands, tenements and hereditaments. Corporeal hereditaments are confined to land which, according to Lord Coke, includes not only the ground or soil, but everything attached to the earth, whether by the course of nature, as trees, &c., or by the hand of man, as houses and other buildings. 3 Kent, [528]; 1 Coke Litt., [197, a.] According to all the authorities this definition embraces the property in question.
In 68 N. Y., 554, Smith vs. The Mayor, a pier in a river is held to be real estate within the meaning of the tax laws. See also State vs. Northern Central Railway Co., 18 Md., 217, and Northern Central Railway vs. Canton Co., 30 M., 354. In the latter case it was held that the rails fastened to the road-bed of a railroad were real estate. In Snederker vs. Waring, 12 N. Y., the court held that a statue placed upon a pedestal built some distance in the earth, not secured to the pedestal except by its own gravity, was to be considered part of the real estate, so as to pass to a purchaser under a trust deed of the land, as against a purchaser under a judgment levied upon the statue as personalty.
The piers supporting this aqueduct extend down a great depth below the bottom of the river and are fastened to the solid rock. The wooden bridge is firmly attached to and incorporated with the stone work, and it would be impossible that it could be considered as personalty or anything else but real estate within the meaning of the tax laws. The taxes for the subsequent years are levied under a later statute which authorizes the assessment of personal as well as real estate, and this point is not of importance as respects the taxes for these years, as the property, if assessable at all, was sufficiently assessable under one designation or the other.
Fourth. It is contended on the part of the complainant that the proceeding of the assessors and District authorities in respect of this tax were so imperfect and faulty that the Court should enjoin their collection. We have been re *228 peatedly reminded in the argument, that these .complainants are non-residents, and it seems to be supposed that they are entitled upon this ground to special favor. The courts have had no difficulty in some of the States in answering the argument made in support of legislation which has attached additional burdens to the property of nonresidents, that such inequality was just, in view of the fact that the absentee renders no personal service to the govern - ment by way of militia or road duty or as a voter ; and that those who protect his property in his absence should bear a lighter burden than the absentee, but the decisions have held that all such burdens should be equal against all property holders, and such was the special provision of the act establishing the District government. But surely there is no warrant for the contention that a non-resident should be dealt with in this particular with more leniency than the resident.
It is averred that for thirty years this company was not charged with taxes upon its property. This circumstance cannot avail if the tax is a legal one. In the case of the Annapolis & Elk Bidge Railroad Co. forty years had intervened, and in the case in 3 Mac Arthur, Baltimore & Ohio R. R. Co. vs. The District, more than twenty years had passed without the claim of taxation, but the court nevertheless sustained the right to tax when the subject was finally brought to their attention. TJie fact that the complainants have been so long exonerated from this burden should make them the more willing and able to pay at this time.
The assessment of this property upon the books of the corporation is in these words: “ Alexandria Canal Company; Beatty, Peter, Threlkeld & Deakin’s addition ; valuation; $75,000 ; wooden bridge across the Potomac.” It is insisted in the bill that the amount of this assessment represents a grossly exaggerated valuation, as appears from the evidence in the case, which shows that the entire cost of the bridge was about $27,000. It is hardly necessary to cite authorities to show that it is not competent for a court, in a proceeding like the present, to examine the question whether the assess *229 ment of property was too high. In the language of the Supreme Court, 2 Otto, 612, State Eailway Cases: “Perfect equality and perfect uniformity of taxation as regards individuals or corporations, or the different classes of property subject to taxation, is a dream unrealized.” “If there is an excessive- estimate of the value of the franchise, or capital stock, or-both, it is by error of judgment in the officers to whose judgment the law confided that matter ; and it does not lie with the court to substitute its own judgment for that of the tribunal expressly created for that purpose.” And if the court possessed the power to reappraise, there is nothing before us from which we could arrive at a decision, or affirm that the appraisement was too high. It surely could not be considered just to' assess the bridge at the mere cost of the planks. Many authorities show that the use permitted to be made of the property under the franchise enters as a constituent into the true valuation. In the words of this court, in 2 Mac Arthur, 192, Robinson vs. Cook : “¥e are of opinion, that as the complainant had an opportunity to appeal from the assessment, if there was any error in the valuation, to the board of appeal, she ought to have pursued that course.” See, also, 2 Mac Arthur, 562, Alexander vs. Dennison.
Whatever adverse criticisms may have been made, from time to time, upon the laws passed by the Legislative Assembly during its brief existence, its acts respecting the assessment of property seem to have been inspired by a desire to do full justice to the property owner where an assessment was incorrect. The acts of 1st session of 1871, ch. 23, and the amendments to that law, make it the duty of the assessors “ to personally inspect and examine all real estate ” within their districts, and to ascertain from each individual the nature of his property, and return the name of the owners, and every person or corporation or association is required,, within fifteen days after notification by the superintendent, to furnish a corrected list of all property, filling up the blank forms, which it is the duty of the assessor to leave with each property owner. A board of appeal is created *230 which is to sit at a designated time, after public notice in not less than three newspapers, of the time and place of its session. By' one of the laws this board is to remain in session 100 consecutive days in every third year, and 30 days during the intervening years. The appeal board is authorized and required to hear all complaints as to overvaluation or impropriety of assessment, and to redress the wrongs1 complained of, and the law declares their action shall be complete and final. The superintendent, of assessments and taxes, after the revision by the board of appeal, is to prepare in duplicate complete and accurate lists, giving alphabetically the names of all parties assessed, with a description of their property, one of which lists he is to retain and the other is to be lodged in the office of the collector. Immediately after the levy is completed, it is made the duty of the tax-collector, who is also acting under oath, after giving bond, to send an account of the taxes levied to each property-holder, notifying him that the tax must be paid within a designated period under penalty, and within sixty days after the expiration of this period, the collector is required to publish a complete list of arrears of taxes, and make sale of the property of delinquents, and the act declares that no sale thus made shall be void because of a failure to comply with any matter of form.
These acts of the legislative assembly are recognized by several acts of Congress ; among others, by the act of the 20th of June, 1874, ch. 113, of 1875, ch. 162, the act of the 3d of April and 19th of June, 1878.
It is evident from an examination of these acts, that a property owner within the District could scarcely remain in ignorance that an assessment had been made upon his property and that he was required to pay a tax, and, if persons with a full opportunity to complain of any injustice committed by the assessors, wilfully neglect to avail themselves of the opportunity so amply afforded them, they cannot expect a court of equity, after long delay, to relieve them from the consequence of their own laches.
In O’Neal vs. The Virginia and Maryland Bridge Company *231 •at Sheperdstown, 18th Maryland, 1, the bridge company •applied to an equity court to enjoin the county commis-' ■sioners of "Washington county, Maryland, from selling its property for the payment of State and county taxes levied on the bridge. By the Maryland law similar duties to those prescribed by the acts of the legislative assembly of the District, were enjoined upon the county assessors. Among others they were required to make an alphabetical list of the property owners, so that persons interested could readily discover whether they were charged with taxes. In that case the property was entered on the assessors’ book in the name of the Potomac Bridge Company instead of .the Virginia and Maryland Bridge Company, at Sheperdstown, the actual name •of the corporation. But the court held that as the corpoi’ation had knowledge of the assessment, and there was no reason why they did not go before the commissioner and have the error as to the name corrected, equity could not interfere in its behalf; that tax assessments ought not to be vacated and property released because public officers have not strictly followed provisions of the law, which are merely directory, and that assessments are not invalid if such directions are not complied with ; that if the property owner omits to pursue the relief offered by the tax laws against the improper exercise of the taxing power, he cannot be relieved in equity, if at all, unless a strong case is presented ; that in such case the property-owmer must show that he has not been in default in availing himself of the means provided by the tax laws, and there must be something more than legal error assigned — facts must be presented appealing to the conscience of the court to prevent wrong and injustice ; that if the objection as to the manner of making the return of the assessment is merely technical, and goes to matter of form and not to substance, a court of equity ought not to interfere ; that as the tax laws require public notice of the meeting of the commissioners to correct errors, &c., in assessments the laws and publication impute notice to all persons whether they have actual information ■or not 1 and that as the tax laws authorize the commission *232 ers to increase or abate valuations and to exclude property improperly valued; a court of equity has no jurisdiction h> make corrections.
In that case the court affirmed the right of the authorities of Washington county to levy the tax upon the bridge belonging to the Virginia and Maryland Bridge Company; under an assessment which included the entire bridge of the complainant, except so much of the abutment on the Virginia shore as was beyond the limits of Maryland, as prescribed by the charter to Lord Baltimore.
Fifth. There is, however, one ground upon which we think this injunction must be sustained. The assessment unquestionably was designed to be upon the wooden bridge, and not upon the stone structure, or the canal. But this, wooden bridge, as we have seen, consists, first, of that part within the town of Georgetown ; second, of that part between the shores of the river, and third, of that part of the causeway between the high-water mark on the Virginia shore and the level ground in Virginia. The language of the assessment is, “ upon the wooden bridge,” which word seems to describe an entire structure, and not a part of a bridge. Still if the matter stood on this alone, (upon the presump-' tion that public officers are supposed to discharge their duties properly.) the conclusion might be that they only designed to assess so much of the wooden bridge as was. within their jurisdiction ; that is to say, all of the-structure north of the high-water mark on the Virginia shore.
But the complainants alleged in the bill that they were uncertain what was designed to' be included in the assessment, and the more so, because the tax bill simply stated that the tax was levied upon “the bridge” at a valuation of $75,000; and the commissioners were required “to show, state, and discover upon what property the said assessment was made ; whether it included or was intended to include the whole aqueduct, embracing the stone piers, the wooden and iron structure through which the canal passes, and used-by boats and boatmen navigating the canal and the road bridge over the canal, with the approaches on the Virginia *233 shore as well as those on the District shore ; and, if the assessment was intended to cover only the road bridge, that they may discover whether the whole bridge across the river, embracing the approaches on the Virginia shore as well as the approaches on the District shore, were intended to be included, and were in fact included in said assessment; and if the assessment was only intended to cover a part of the structure, less' than the whole, that they may discover and answer what part was intended to be included, and was in fact included in said assessment and tax; and that they may discover, show, and answer how, in making said assessment, they made up the value of the property so assessed; whether the cost of constructing the road bridge was considered, or the present value of the structure on the part of it so assessed, or whether they estimated its value by the amount of its gross or net earnings.”
The commissioners in their answer declare “ that tlie assessment in said bill mentioned is upon the wooden bridge across the Potomac river, and constructed in part upon Beatty, Peter, Threlkeld, and Deakin’s addition to the city of Georgetown, and that only that portion of said bridge which is within the limits of the District of Columbia was designed to be sold.”
Where a bill is filed for a discovery, the general rule applies that the answer of the defendant, if responsive, is evidence in his favor, unless overcome by the testimony of two witnesses, or one witness with corroborating circumstances. Turner vs. Knell, 24 Md., 60. There can be no-reason why admissions in such an answer in favor of the complainant should not have the force of testimony in his favor. It seems plain from the answer of the commissioners that they distinguish between the entire wooden bridge upon which the assessment was made, and that portion of the bridge which they design to sell. When they are stating what was assessed, they declare it was uthe wooden bridge ”— that is the entire bridge, but in describing what they intend to sell they aver it is only that portion of said bridge which was within the limits of the District.
*234 They admit, therefore, that there is a portion of the bridge which has been assessed by them not liable to be sold, and this must be the portion lying in Virginia. The answer contains effectively a claim of the right of the commissioners to assess the entire bridge, though, they only claim the right to sell that portion of it which is within their jurisdiction. If they have assessed the entire bridge, including that part which lies within the State of Virginia, the assessment is invalid. "We cannot, in this proceeding, undertake to deduct for the overcharge by looking through the evidence to ascertain what the respective portions of the bridge originally cost. The franchise to use the bridge, as we have seen, may well enter into the assessment of its value, and we cannot apportion, if we had the right to attempt to do so, the share of the value of this franchise appurtenant to any particular portion of the structure.
This is not a case merely of excessive valuation, or of an omission upon the part of officials to comply with the directory provisions of the statute; but it is a claim advanced in this court by the District authorities to levy a tax upon the entire bridge, including that portion within Virginia, and we must, therefore, hold the assessment was illegal, and the collection of the tax should not be enforced. We are not to be understood as deciding that the granting of this injunction is to be considered as an acquittance of the tax properly due to the District. We are only deciding, that, for the reasons stated, no valid sale can be made under the •assessment.
Sixth. It has been insisted upon the part of the District of Columbia that this court is inhibited from granting an injunction in the present case by Section 3224 of the Revised Statutes of the United States, which declares: “No suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court.” TMb section is placed under the article “Internal Revenue,” and seems manifestly to apply to cases arising under the enforcement of that article. But the Supreme Court, in 2 Otto, 613, have declared that it was only intended to apply to taxes *235 levied by the United States. It can, therefore, have no application to the present taxes, which are levied by a municipality, although under- authority of the United States laws.
It has been held in many cases by the courts that the mere illegality of a tax is no ground for the interposition of a court of equity, but that there must exist, in addition, special circumstances bringing the case under some recognized head of equity jurisdiction, such as that the enfoi’cement of the tax would lead to a multiplicity of suits or produce irreparable injury, or throw a cloud upon the complainant’s title to.real estate. Dow vs. City of Chicago, 11 Wall., 109. But we are of opinion that the general language used in the class of cases referred to applies to taxes levied by the sovereign alone.
In High on Injunctions, section 369, the author says: “Dr will be found on examination that courts of equity have been inclined in the cases of assessment of municipal corporations, to relax somewhat the stringency of the rule of non-interference as applied to the collections of State taxes. Thus a city assessment without authority of law will be enjoined, even where no question as to cloud upon title is raised.”
And in 2 Otto, 613, the State Railway Cases, the Supreme Court, after reiterating the general principle announced in Dow vs. Chicago, says: “ Whether the same rigid rule shall be applied to taxes levied by counties, towns and cities, we need not here inquire; but there is both reason and authority for holding that the control of the court in the exercise of power over private property by these corporations is more necessary and is unaccompanied by many of the evils that belong to it when affecting the revenues of the State.” And the above section from High on Injunctions is cited by the court to sustain this qualification of its former opinion. See also Webster vs. Commissioners, 51 Md.
For this reason we think equity has jurisdiction to grant the injunction in the present case, and the decree below is affirmed, but upon the single ground discussed in the fifth point.